UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. CR408-019 |
| | ) | |
| BEN DA ZHU, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Ben Da Zhu, who is charged with harboring and employing undocumented aliens, has filed a motion to suppress evidence seized during warrant-based searches of his home and business, as well as statements he made to federal agents after his arrest. (Doc. 16.) The Court held a hearing on these matters, at which time the government offered testimony from Agents Scott McCormack and Gregory Ricks of Immigration and Customs Enforcement ("ICE"). Zhu did not testify. For the following reasons, his motion to suppress should be **DENIED**.

I. **ANALYSIS**

Defendant contends that any evidence seized during the search of his home and business should be suppressed because the search warrants were not supported by probable cause and they failed to identify the items to be seized with sufficient particularity. (Id.) He further contends that any statements he made should be suppressed because they were taken in violation of his rights under Miranda v. Arizona, 384 U.S. 436 (1966).[1] (Doc. 16.)

A. **Probable Cause**

Zhu first argues that the affidavits presented by Special Agent Scott McCormack were insufficient to support a finding of probable cause that evidence of the harboring and employment of undocumented aliens would be found at his home and business. (Id.) A thorough review of the affidavits

---

[1] Zhu also argues that any statements should be suppressed pursuant to Article 36 of the Vienna Convention on Consular Relations. (Doc. 16 at 2-3.) Zhu contends that the agents failed to notify the Chinese consulate of the arrest and failed to notify him of his rights under the Treaty. This argument fails for two reasons: First, at the hearing it was established that Agent McCormack promptly informed Zhu of his rights under the Treaty, and he promptly forwarded notification of the arrest to the Chinese consulate in Houston, Texas. Second, the Supreme Court has explicitly held that the exclusionary rule does not apply to statements taken in violation of Article 36 of the Vienna Convention. Sanchez-Llamas v. Oregon, 126 S. Ct. 2669, 2681 (2006); see also United States v. Duarte-Acero, 132 F. Supp. 2d 1036, 1037-39 (S.D. Fla. 2001). Consequently, suppression is not an appropriate remedy for a violation of this treaty.

2

demonstrates otherwise.

The search warrant affidavits relate that on May 18, 2005, Heritage Bank in Hinesville, Georgia advised the Federal Bureau of Investigation ("FBI") that Ben Da Zhu had transferred monies in excess of $500,000 from the bank to the People's Republic of China.[2] On November 28, 2005, Agent McCormack and FBI Special Agent Crum followed up on this tip by interviewing Barbara Smith, a senior vice president with Heritage Bank. She told the agents that Zhu regularly brought other people into the bank to conduct the wire transfers. The accompanying person's name and Social Security number were used, but it was clear to the bank employees that Zhu was in possession of the money and orchestrated the transactions. Smith believed that Zhu was structuring the transactions to evade certain federally mandated reporting and recordkeeping requirements. Out of the fifty-six wire transfers conducted by Zhu between March 4, 2003 and March 15, 2005, forty-seven used other individuals' names.[3] Many of the wire

---

[2] A check of the ICE Central Index System revealed that Zhu was ordered excluded from the United States on August 17, 1992 by an Immigration Judge sitting in New York, New York.

[3] At the hearing, Zhu argued that Smith's testimony was based on second-hand knowledge, and like most statements in the affidavit, her statements were mere conclusions. He apparently believes that the lack of supporting details in the affidavits

3

transfers were made by aliens, but some were made by U.S. citizens.

Because Fort Stewart was nearby, Crum and McCormack provided the non-alien names from the Heritage Bank list to the Army Criminal Investigation Division so that they could check them against the Department of Defense's employee database. The name check revealed that some of the individuals who engaged in the suspicious banking transactions included former military personal, retired military personnel, and military dependants. Consequently, Crum contacted an active duty soldier who had been present at one of the transactions. The soldier agreed to meet with him and discuss the case.[4]

The soldier had worked for Zhu as a delivery driver. He stated that over the course of his employment, it became clear that Zhu supplied

---

(such as the names of the recipients of the money transfers) undermines the assertions made therein. Of course, probable cause assessments may rest upon hearsay when (as here) there is a substantial basis for crediting that hearsay. Jones v. United States, 362 U.S. 257, 272 (1960). Furthermore, when considering an application for a search warrant, the court is to consider the totality of the evidence, rather than atomizing the affidavit into discreet factual averments and analyzing the significance of each fact in a vacuum. United States v. Ventresca, 380 U.S. 102, 109 (1965). The affidavits, read in their entirety, furnished reasonable grounds to believe that Zhu was harboring undocumented aliens.

[4] The soldier is a confidential informant. The Court has no knowledge of his or her gender. For the sake of simplicity and readability, the Court will occasionally refer to the soldier as a male.

workers to Chinese restaurants in the Hinesville area. Zhu allegedly traveled by car to New York City, picked up undocumented Chinese aliens, then brought them back to Hinesville to train them as cooks in his restaurant. He then supplied the workers to several other Chinese restaurants in the area. The soldier indicated that Zhu trained the workers because he received a larger payment for experienced workers. On August 2, 2006, the agents looked at Zhu's cell phone records. He regularly made calls to the New York City area, which corroborated the soldier's story.

The soldier began working for Zhu in 2000 and remained periodically employed at the restaurant until 2004. When he was hired, Zhu did not require him to establish his identity for employment eligibility. He was paid in cash at the end of each night. Zhu computed the soldier's commission through the use of a hand-written ledger of all of the restaurant's daily sales and deliveries. To the soldier's knowledge, each of the employees at Orient Express (Zhu's restaurant) were paid in cash with no withholdings or deductions. In addition, he stated that the cooks worked approximately twelve hours a day, six days a week, and they were paid $450 in cash weekly.

In an attempt to gain a better understanding of Zhu's business operations, McCormack and Crum had the soldier meet with Zhu on four occasions in November 2006. The soldier discovered that Zhu provided trained cooks to Wok & Roll, Mandarin Garden, and China Super Buffet, and Zhu visited those restaurants on a weekly basis to speak with their owners. On November 15, 2006, the soldier entered the Orient Express to identify several workers from photographs in their alien files. All of the workers previously accompanied Zhu to transfer funds to China from the Heritage Bank. Three of the four cooks working there on that date were subject to warrants of deportation. The soldier also identified Zhu's wife, Chen Ting Cai; she worked at the restaurant and had no immigration status on record.

A second informant, also a former delivery driver, corroborated the soldier's account of Zhu's business practices. The informant stated that the cooks earned $100 per day in cash, rather than $450 per week reported by the soldier. But the informant again described Zhu's delivery ledger and his practices of paying all employees in cash with no withholdings and not requesting identification to determine employment eligibility. Additionally,

the informant indicated that Zhu usually employed three cooks a day, and all of the cooks lived with Zhu at his residence at 14 Dogwood St. in Hinesville.

On March 17, 2006, the informant accompanied Zhu to one of his wire transfers at a Western Union outlet.[5] Upon arrival, the Western Union representative knew exactly what Zhu expected him to do with the money; it was obvious that he was familiar with Zhu. The informant helped Zhu wire a "bag of cash" to the Peoples Republic of China.

To further corroborate the informants' stories, the agents began video surveillance of Zhu's business and residence. On six occasions between April and May of 2007, Zhu, driving a gold 2005 Toyota Sienna, transported two to four Asian nationals between his home and his restaurant.

Additionally, Agent McCormack examined the Georgia Department of Labor Quarterly Tax and Wage Reports for each quarter in calendar years 2005 and 2006. The reports revealed that the Orient Express reported only three or four total employees for each quarter. This is at odds

---

[5] Zhu apparently curtailed his wire transfers from the Heritage National Bank in March of 2005. Since then, he made several transfers from Western Union outlets.

with the number of workers observed during surveillance and reported by the two informants. The records also failed to include the Social Security numbers of Zhu and his wife.

Agent McCormack believed that all of these facts, taken together, indicated that Zhu was employing undocumented aliens. Accordingly, on January 22, 2008, he applied to this Court for warrants to search Zhu's home and business for further evidence supporting this inference. The Court issued the warrants after careful consideration of McCormack's affidavits.

Zhu contends that the warrant affidavits reveal "no connection between the alleged illegal transactions and the residence or business premises." (Doc. 16 at 4.) Consequently, he argues that the warrants are not supported by probable cause. (Id.)

The Constitution provides that no search warrant shall issue except "upon probable cause." U.S. Const. amend. IV. While the probable cause standard has never been precisely quantified, it is settled that it requires neither convincing proof nor even a prima facie showing of criminal activity. Illinois v. Gates, 462 U.S. 213, 235 (1983). A "substantial chance" of

criminal activity is all that is required, "not an actual showing of such activity," id. at 244 n. 13, and it need not arise from direct observation but may be inferred from the circumstances involved. United States v. Jenkins, 901 F.2d 1075, 1080 (11th Cir. 1990); United States v. Lockett, 674 F.2d 843, 846 (11th Cir. 1982). On review the Court is not to make a *de novo* determination of probable cause; it is merely to evaluate whether the issuing magistrate had a substantial basis for finding probable cause. Gates, 462 U.S. at 238-39.

McCormack has been an ICE agent for seven years. Before the formation of ICE, he worked as an Immigration and Nationalization Service inspector for many years. He noted in the affidavits that based upon his extensive experience, employers who harbor undocumented aliens regularly shield those aliens from detection by supplying housing to the undocumented workers and transporting those workers to and from work. By supplying housing to the workers, their names do not appear on any leases and they cannot be easily discovered through the use of record checks and subpoenas. By transporting the workers, the aliens avoid law enforcement scrutiny and the difficulty of obtaining a valid driver's license.

Another common method of avoiding scrutiny is by paying illegal workers in cash because it is difficult for aliens without valid identification to cash checks with legitimate banking institutions. Additionally, McCormack indicated that the restaurant's apparent failure to report all of the employees in its quarterly tax and wage reports is the typical practice of those who employ undocumented aliens; the employer cannot comply with governmental reporting requirements for workers who lack a valid social security number and cannot risk reporting a known fraudulent number.

McCormack's educated deductions and inferences, taken along with the suspicious financial transactions and the strange living and employment conditions observed by the agents, lead the Court to the find that the affidavits sufficiently link Zhu's residence and business to the possible harboring and employment of undocumented aliens. The information Agent McCormack provided the Court in his affidavits was therefore sufficient to establish a substantial basis for a probable cause finding to search Zhu's business and residence. Gates, 462 U.S. at 238-39.

### B. Particularity

Defendant next contends that the warrants fail to satisfy the Fourth

Amendment's particularity requirement. (Doc. 16.) Once again, a thorough review of the warrants and accompanying affidavits refutes this contention.

General warrants do not satisfy the Fourth Amendment requirement that the warrant contain a description of the place to be searched and the persons or things to be seized. See Dalia v. United States, 441 U.S. 238, 255 (1979). The particularity requirement protects persons against indiscriminate rummaging through their property by government agents. Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). A description in a warrant is sufficiently particular "when it enables the searcher reasonably to ascertain and identify the things to be seized." United States v. Santarelli, 778 F.2d 609, 614 (11th Cir. 1985); United States v. Betancourt, 734 F.2d 750, 754-55 (11th Cir. 1984).

Here, the warrants were no doubt broad in scope.[6] However, both

---

[6] Both warrants sought: (1) all travel and employment authorization documents; (2) all accounting and tax documents, books, ledgers, and records pertaining to Ben Zen Foods, Inc., Orient Express, Eastern Dragon, and any other corporation controlled by Zhu; (3) all records pertaining to wire transfers of money and any cash or monetary instruments; and (4) records evidencing ownership, occupancy, or control of the restaurant and residence. In addition to the items listed above, the warrant for the search of the restaurant requested any notebooks used to keep track of each driver's deliveries and the amount that they were to be paid.

warrants specifically limited the search to "[a]ny and all files relating to the harboring, transporting, importation and employment of unauthorized aliens." When warrants specifically connect the items to be searched for and seized to the specific criminal conduct suspected, it weighs in favor of finding that the warrants are adequately particularized. See United States v. Kow, 58 F.3d 423, 427 (9th Cir. 1995) (finding that overly broad warrant which authorized seizure of virtually every document and computer file could have been made more particular by specifying suspected criminal conduct); United States v. Bianco, 998 F.2d 1112, 1116 (2nd Cir.1993) (finding warrant overly broad in part because it did not make reference to any type of criminal activity).

Additionally, while portions of the warrants authorized the search and seizure of documents concerning a broad spectrum of financial and business activities, the specific criminal conduct under investigation justified a broad search of these documents. When law enforcement officers cannot give an exact description of the materials to be seized even though they have probable cause to believe that such materials exist, the courts have upheld warrants "when the description is as specific as the circumstances and the

nature of the activity under investigation permit." Santarelli, 778 F.2d at 614 (citations omitted); see also United States v. Jones, 54 F.3d 1285, 1290 (7th Cir. 1995) ("In practice, courts have therefore demanded that the executing officers be able to identify the things to be seized with reasonable certainty and that the warrant description must be as particular as circumstances permit.") (citation omitted). Based upon the nature of the crimes charged, the warrants could not reasonably be expected to state with greater specificity the items to be seized. See Santarelli, 778 F.2d at 609 (holding that warrant authorizing the seizure of "all property" constituting evidence of loansharking was not overly broad because the exact identity of the evidence to be seized could not have been known at the time the warrant issued); United States v. Morisse, 660 F.2d 132, 136 (5th Cir. 1981) (upholding validity of warrant allowing for search and seizure of "drug trafficking paraphernalia, records, money, and other evidence of drug trafficking"); see also United States v. Riley, 906 F.2d 841 (2nd Cir. 1990) (upholding warrant for "records of the distribution of cocaine [and of] the investment of proceeds of drug trafficking in tangible or intangible objects and things").

For all of the reasons explained above, the warrants were sufficiently particular to satisfy the Fourth Amendment.[7]

## C. Defendant's Statements

Defendant finally contends that any statements he made during his interview with Agent Ricks of ICE and Agent Crum of the FBI should be suppressed as the product of an improper custodial interrogation. (Doc. 22.)

The facts supporting his contention are as follows. At approximately 6:05 a.m. on the morning of January 23, 2008, Ricks and several other government agents executed the search warrant for Zhu's residence, which was located at 14 Dogwood Street in Hinesville, Georgia. Zhu was immediately arrested by the first agents who entered the house. Ricks then transported Zhu to his restaurant to unlock it and disarm any alarms, so that the ICE agents would not need to resort to forced entry; he also hoped to interview Zhu at the restaurant because Zhu's home was overrun with agents and residents.

---

[7] Zhu also argues that it was unreasonable for the agents to rely upon the warrants. (Doc. 22 at 3.) He cites to United States v. Leon, 468 U.S. 897, 926 (1984), which created the good faith exception to the probable cause requirement. As the warrants are valid, there is no need for the government to invoke the good faith exception.

Upon arrival at the Orient Express, Ricks and Crum promptly advised Zhu of his rights, as required by Miranda, 384 U.S. 436.[8] It is undisputed that Zhu is conversationally proficient in English, though Chinese is his native language. After conversing with Mr. Zhu, the agents did not believe that he needed an interpreter. Ricks and Crum allowed Zhu to read the rights waiver, and they then they re-read it to him aloud, line-by-line. If he did not understand a word or phrase, it was explained to him in detail. Zhu printed his name and signed the waiver at 8:21 a.m.

During the interview, it came to the agents' attention that Zhu owned another restaurant at 449B General Screven Way. Zhu consented to its search. The agents transported him to that facility. It became clear to them that there was no need to perform a detailed search of that building, so they continued the interview. The agents returned to the Orient Express

---

[8] It is well settled that law enforcement officials may not conduct a custodial interrogation of a suspect without first advising him of the rights guaranteed by the Fifth Amendment. Miranda, 384 U.S. at 471. Miranda determined that any custodial interrogation of a suspect involves "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." Id. at 467. The Supreme Court therefore created a conclusive presumption that evidence produced by custodial interrogation is coerced unless the suspect is first informed "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed," during any questioning. Id. at 444.

for a moment, then transported Zhu to ICE's Quick Reaction Team ("QRT") headquarters in Savannah.

Zhu allegedly made several incriminating statements, though it is not clear whether they were made at the Orient Express, the second restaurant, or both. Zhu contends that any statements he made during the searches of his businesses were taken in violation of Miranda.[9] (Doc. 16 at 5-6.) The Court concludes, however, that Zhu voluntarily, knowingly, and intelligently waived his Miranda rights. Zhu speaks English at a conversational level. He indicated that he understood his rights, and he willingly signed the waiver form and answered the agents' questions. There is no evidence indicating that Zhu was confused about what rights he was waiving or the consequences of his decision to consent to the interview. Nor is there any evidence that Zhu's decision to submit to questioning was the product of any improper coercion by the agents. Consequently, the statements should be admitted.

---

[9] He also argues that any statements made at Zhu's residence should be suppressed. (Doc. 16) At the hearing, however, the agents testified that Zhu was immediately placed in a Hinesville police cruiser upon arrest. Counsel for defendant did not contest this characterization of the events.

## II. CONCLUSION

For the foregoing reasons, defendant's motion to suppress should be **DENIED**.

**SO REPORTED AND RECOMMENDED** this 30th day of April, 2008.

*/s/ G.R. Smith*
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA